613 So.2d 1249 (1993)
James LOLLAR and Brenda G. Lollar
v.
Dr. Felix M. TANKERSLEY.
1910738.
Supreme Court of Alabama.
January 29, 1993.
Rehearing Denied March 5, 1993.
*1250 Stephen M. Langham, Prattville, for appellants.
Charles A. Stakely of Rushton, Stakely, Johnston & Garrett, Montgomery, and T.O. McDowell, Prattville, for appellee.
PER CURIAM.
James and Brenda Lollar appeal from a summary judgment in favor of Dr. Felix Tankersley on their claims alleging medical malpractice. We affirm.
On September 15, 1989, Brenda Lollar was examined by Dr. Tankersley, a licensed, board-certified obstetrician, who concluded that she was approximately three months pregnant. On September 27, Mrs. Lollar began to hemorrhage; she telephoned Dr. Tankersley. On his advice, she reported to the emergency room at Autauga Medical Center in Prattville. There, Dr. Tankersley advised her that she "was experiencing an inevitable, first-trimester, spontaneous abortion (miscarriage)." On the basis of this diagnosis, he performed a "dilatation and curettage" ("D and C") in order to remove the remaining placenta and fetal tissue from the uterus. She was released from Autauga Medical Center the same day.
On October 9, 1989, Mrs. Lollar began to hemorrhage again; she immediately returned to Dr. Tankersley for another examination. Following this examination, Dr. Tankersley referred her to Dr. Donna Gelder at the Obstetrics-Gynecology Center of the University of Alabama at Birmingham ("UAB").
On October 10, ultrasound tests performed at UAB revealed that Mrs. Lollar was still carrying a "well developed" fetus with a "viable heartbeat." Tests further revealed, however, a deficiency in the level of amniotic fluid in the uterus; this deficiency made a successful pregnancy unlikely. For this reason, another D and C was recommended. Mrs. Lollar refused the recommendation at that time because, she contends, she wanted to continue her pregnancy, if possible. The amount of amniotic fluid, which was monitored on a daily basis following the initial visit to UAB, did not increase, and, on October 13, following the onset of severe pain, she entered UAB, where the uterus was successfully evacuated.
On May 25, 1990, James and Brenda Lollar sued Dr. Tankersley in a complaint containing two counts. In the first count, James Lollar alleged that the defendant had wrongfully caused the death of his unborn child by failing to "conduct the proper diagnostic procedures and tests to determine the viability of [the] unborn child," and by performing an unnecessary D and C, which, he alleged, resulted in perforation of the amniotic sac with a consequent loss of amniotic fluid. In the second count, Brenda Lollar alleged, inter alia, that the defendant had "negligently or wantonly performed" a D and C and that his doing so had resulted in additional medical expenses and mental suffering.
Dr. Tankersley moved for a summary judgment, supporting his motion with two of his own affidavits. In opposition to the defendant's motion, the Lollars filed the affidavit and deposition of Dr. William Daniel, a licensed, board-certified obstetrician-gynecologist. The trial judge granted the defendant's motion for summary judgment.
On appeal from the summary judgment, the plaintiffs contend that the affidavits and deposition filed with the court raised genuine issues of material fact and thus rendered a summary judgment inappropriate. The defendant argues that the qualifications of Dr. Daniel, the plaintiffs' proffered expert witness, do not conform to Ala.Code 1975, § 6-5-548. For this reason, the defendant contends that the affidavit and deposition submitted by the plaintiffs were inadmissible, and that the plaintiffs, therefore, offered no evidence in opposition to the motion for a summary judgment.

I. James Lollar's Claim
This case presents an issue of first impression in this Court: Whether the Alabama *1251 Wrongful Death Act, Ala.Code 1975, § 6-5-391, permits an action based on the performance of a dilatation and curettage procedure that results in the death of a nonviable fetus. Because two other cases on this Court's docket, Gentry v. Gilmore, (1910254), and Alley v. Service America Corporation, (1910447), presented similar issues, we consolidated the three cases for oral argument. Subsequently, Service America Corporation filed for bankruptcy protection and this Court has stayed all proceedings in that appeal; the parties to the Service America case appeared as amici curiae in this case, favoring the Court with oral arguments and briefs. See Gentry v. Gilmore, 613 So.2d 1241 (Ala.1993).
Section 6-5-391 provides: "When the death of a minor child is caused by the wrongful act, omission or negligence of any person ..., the father, or the mother..., or ... the personal representative of such minor may commence an action, and in any case shall recover such damages as the jury may assess...." It is undisputed that the disposition of this issue is controlled by the construction placed upon § 6-5-391 in Eich v. Town of Gulf Shores, 293 Ala. 95, 300 So.2d 354 (1974); Wolfe v. Isbell, 291 Ala. 327, 280 So.2d 758 (1973); and Huskey v. Smith, 289 Ala. 52, 265 So.2d 596 (1972). The parties disagree fundamentally, however, over the nature of the principle derived from this construction. Dr. Tankersley and Service America contend that the Eich-Wolfe-Huskey trilogy recognizes a cause of action for the death of a fetus that attains viability, that is, a state of "such form and development of organs as to be normally capable of living outside the uterus," Wolfe, 291 Ala. at 329, 280 So.2d 758, either before the injury or before death results from the injury. The Lollars and the Alleys (the plaintiffs in the Service America case), however, contend that under these cases, viability is simply irrelevant.
In Huskey, this Court recognized a cause of action for the death of a child due to injuries suffered in an automobile accident during the eighth month of his mother's pregnancy where the child was born alive but died five days thereafter. In doing so, the Court overruled Stanford v. St. Louis-San Francisco Ry., 214 Ala. 611, 108 So. 566 (1926), which had "held that a prenatal injury afforded no basis for an action in damages, in favor of the child or its personal representative." 289 Ala. at 54, 265 So.2d at 596. The Court noted in Huskey that it was, at the time that case arose, the only jurisdiction in the United States "denying to a parent or legal representative the right to proceed in a wrongful death action where (a) the fetal child was viable at the time of the injury and (b) the child [was] born alive." Id. (emphasis in original).
One year later, this Court recognized a cause of action for the death of a child due to injuries it suffered in an automobile accident occurring prior to viability, where the fetus subsequently attained viability and was born alive but died within an hour of birth. Wolfe v. Isbell, 291 Ala. 327, 280 So.2d 758 (1973). In rejecting the contention that a post-natal child's right to maintain a cause of action turned on whether the injury was sustained in a pre-viable or post-viable state of fetal development, the Court cited a plethora of authority recognizing the rights of children to sue for prenatal injuries, Hornbuckle v. Plantation Pipe Line Co., 212 Ga. 504, 93 S.E.2d 727 (1956); Bennett v. Hymers, 101 N.H. 483, 147 A.2d 108 (1958); Smith v. Brennan, 31 N.J. 353, 157 A.2d 497 (1960); Kelly v. Gregory, 282 App.Div. 542, 125 N.Y.S.2d 696 (1953); Sinkler v. Kneale, 401 Pa. 267, 164 A.2d 93 (1960); Sylvia v. Gobeille, 101 R.I. 76, 220 A.2d 222 (1966); Puhl v. Milwaukee Auto Ins. Co., 8 Wis.2d 343, 99 N.W.2d 163 (1959); and for wrongful death of a parent, LaBlue v. Specker, 358 Mich. 558, 100 N.W.2d 445 (1960); and recognizing the inheritance rights of posthumous children. Barnett v. Pinkston, 238 Ala. 327, 191 So. 371 (1939). From the authorities cited, it is apparent that the Court's attention was directed to instances in which the fetus had attained viability.[1]
*1252 Eich v. Town of Gulf Shores, 293 Ala. 95, 300 So.2d 354 (1974), like Huskey, involved a fatal post-viability injury. In Eich, the injury occurred during the ninth month of fetal development and resulted in the stillbirth of the child. The Court rejected the contention that live birth constituted an element of a cause of action. That the Court ascribed greater relevance to the element of viability, however, is apparent from the following hypothetical example in which viability was the common factor:
"Reconciliation of the proposition that if death occurred after live birth a cause of action exists, but if death occurs prior thereto a cause of action does not exist, is extremely difficult at best. The proposition's inconsistency is best exemplified in the situation involving the death of twins who are wrongfully injured during pregnancy. To allow recovery to the one born alive, who subsequently dies, and to deny recovery to the stillborn who was injured in the same accident is obviously ludicrous."
293 Ala. at 99, 300 So.2d at 357 (citations omitted.)
Contrary to the contention that the Eich-Wolfe-Huskey trilogy abrogated the viability requirement, a close reading of these cases reveals that viability was the commonindeed, the decisiveconsideration, in each case. Huskey and Eich allowed recovery because the fetus was viable at the time of the injury, and Wolfe allowed recovery because the fetus survived the injury long enough to attain viability. The rule proceeding from these cases, therefore, essentially comports with the analysis of Dr. Tankersley and Service America, that is, that a cause of action for death resulting from a pre-natal injury requires that the fetus attain viability either before the injury or before death results from the injury. To eliminate this requirement, as the Lollars and the Alleys propose, would require a substantial expansion of the principle emanating from these cases.
At the present time, it appears that no court in the United States has, without a clear legislative directive, recognized a cause of action for the wrongful death of a fetus that has never attained a state of development exceeding that attained in this case. In this connection, the Illinois legislature, in apparent response to the Illinois Supreme Court's reluctance to dispense with the viability requirement by statutory construction, amended its Wrongful Death Act to create a cause of action based on facts such as those presented here. See Smith v. Mercy Hosp. & Medical Ctr., 203 Ill.App.3d 465, 148 Ill.Dec. 567, 560 N.E.2d 1164 (1990) (discussing Ill.Rev.Stat.1989, ch. 70, par. 2.2 as amended in 1980). Courts in the remaining jurisdictions condition recovery on viability, "quickening,"[2] or live birth. See Comment Recovery for the Wrongful Death of a Fetus, 25 U.Rich. Law Rev. 391, 394-95 nn. 43-49 (1991).
The constructions placed by the courts in our sister states upon wrongful death legislation in their respective jurisdictions counsel caution in our consideration of the question whether a fetus that has never attained viability is a "minor child" within the contemplation of § 6-5-391. The peculiarity in the character of damages recoverable under § 6-5-391 does not dictate that the section be held to create a cause of action that virtually would be unique to the wrongful death legislation in this country. Without a clearer expression of legislative intent, we are reluctant to hold that § 6-5-391 creates a cause of action for the wrongful death of a fetus that has never *1253 attained viability. The summary judgment in favor of Dr. Tankersley was, therefore, appropriate as to the wrongful death claim.

II. Brenda Lollar's Claim
A physician's negligence can be established only through the production of (1) "expert medical testimony as to the proper practice, treatment, or procedure," Dobbs v. Smith, 514 So.2d 871, 872 (Ala.1987), or (2) facts rendering the "lack of skill or care... so apparent as to be within the comprehension of the average layman. Rosemont, Inc. v. Marshall, 481 So.2d 1126 (Ala.1986)." Dobbs, 514 So.2d at 872.
In an effort to avail herself of the first method of proof, Brenda Lollar offered the expert testimony of Dr. William Daniel, who gave the opinion that Dr. Tankersley had breached the applicable standard of care in performing the D and C. In his order granting the motion for a summary judgment, however, the trial judge pointed out numerous reasons for concluding that Dr. Daniel's credentials and experience failed to qualify him as a "similarly situated healthcare provider" as contemplated by § 6-5-548. Therefore, he rejected the proffered testimony.
It is well settled that the trial court has considerable discretion in admitting or rejecting expert testimony. Hagler v. Gilliland, 292 Ala. 262, 292 So.2d 647 (1974); Baggett v. Allen, 273 Ala. 164, 137 So.2d 37 (1962). Under the facts of this case, we cannot say that the trial judge abused his discretion in rejecting the proffered testimony.
Mrs. Lollar therefore did not present competent expert testimony to satisfy the criterion of the first method, and she has not argued for the application of the second method. Neither has she proposed that Dr. Tankersley's own affidavit presented substantial evidence of a breach of due care. Consequently, the summary judgment in favor of Dr. Tankersley is affirmed.
AFFIRMED.
HORNSBY, C.J., and ALMON, SHORES, ADAMS, STEAGALL and INGRAM, JJ., concur.
MADDOX, J., concurs specially.
HOUSTON, J., concurs in the result.
MADDOX, Justice (concurring specially).
I concur with the majority in this case, because the record shows, as a matter of law, that the plaintiffs here did not timely present substantial evidence to support the allegations made in the complaint; therefore, I agree that the trial court properly entered the summary judgment for the defendant.
On the question of the right to maintain a wrongful death action for the death of a nonviable fetus, see my dissenting opinion in Gentry v. Gilmore, 613 So.2d 1241 (Ala. 1993).
HOUSTON, Justice (concurring in the result).
I concur with Justice Merrill's dissent (concurred in by Justices Coleman, Harwood, and McCall) in Eich v. Town of Gulf Shores, 293 Ala. 95, 100-01, 300 So.2d 354, 358-59 (1974). Therefore, I would vote to overrule Eich v. Town of Gulf Shores and would hold that if the child is not born alive then there is no liability for causing the wrongful death of that child. This is consistent with the criminal law. To convict a person of homicide, the victim must be "a human being who had been born alive at the time of the homicidal act." Ala.Code 1975, § 13A-6-1(2). This, I believe, is consistent with the common law. See § 13A-6-1 commentary. There should not be different standards in wrongful death and homicide statutes, given that the avowed public purpose of the wrongful death statute is to prevent homicide and to punish the culpable party and not to compensate for the loss. This does not mean that the mother could not be compensated for the injury she receives.
NOTES
[1] One case cited by Wolfe that did address and uphold a cause of action for wrongful death was Torigian v. Watertown News Co., 352 Mass. 446, 225 N.E.2d 926 (1967). In that case, a pre-viable fetus was injured in an automobile accident. More than two months later, the child was born alive but died within three hours of birth. Id., 352 Mass. at 446, 225 N.E.2d at 926. At the time of death, however, the fetus, at approximately 24 weeks of development, had attained the threshold of viability. See Roe v. Wade, 410 U.S. 113, 160, 93 S.Ct. 705, 730, 35 L.Ed.2d 147 (1973) (viability may occur as early as 24 weeks); cf. Webster v. Reproductive Health Services, 492 U.S. 490, 515, 109 S.Ct. 3040, 3055, 106 L.Ed.2d 410 (1989) (construing Mo.Rev.Stat. § 188.029 (1986) as creating "what is essentially a presumption of viability at 20 weeks" of gestation).
[2] See Porter v. Lassiter, 91 Ga.App. 712, 87 S.E.2d 100 (1955) (recognizing a cause of action where the fetus had quickened).