PER CURIAM.
April Mack (“Mack”), the mother of Baby Mack,[1] appeals from a summary judgment entered by the Jefferson Circuit Court in her action against Thomas Car-mack and Matthew Taul for the wrongful death of her unborn child, known in this litigation as “Baby Mack.” We reverse and remand.

I. Facts and Procedural Histoi"y

On September 13, 2007, Mack was 12 weeks pregnant. On that date, Mack and her fiancé Reginald Thomas, the father of Baby Mack, needed to go to the grocery store, but they were without transportation. Mack contacted Thomas Carmack and asked him to take her and Thomas to the grocery store. Carmack agreed to do so after Mack offered to pay for the trip.
Carmack picked up Mack and Thomas and proceeded to drive to a local grocery store. Carmack’s vehicle was traveling west on First Avenue North in Birmingham when he stopped at a red light at the intersection of that road and 65th Street North. Matthew Taul’s vehicle was traveling east on First Avenue North. In his deposition in this case, Carmack testified that he knowingly proceeded to turn left even though the traffic light was red. He stated that he knew it was a violation of the law to do so and that he in fact saw vehicles opposite him at the intersection, i.e., that were traveling in the opposite direction. He further stated, however, that he assumed he could make the left turn because these vehicles appeared to be stopped. When Carmack turned, however, Taul’s vehicle proceeded through the intersection and hit the passenger side of Car-mack’s vehicle. The force of the collision caused severe damage to Carmack’s vehicle and injuries to Mack and Thomas.
Mack and Thomas were transported by ambulance to the University of Alabama at Birmingham Hospital for emergency treatment. Both suffered severe injuries requiring medical treatment. On September 18, 2007, while hospitalized as a result of the collision, Mack suffered a miscarriage that resulted in Baby Mack’s death.
On November 15, 2007, Mack and Thomas filed an action against Carmack and Taul alleging negligence and wantonness and seeking recovery for their injuries. In addition, Mack filed a wrongful-death claim on behalf of Baby Mack. Discovery was conducted that included depositions of the involved parties.
On August 10, 2009, Mack, on behalf of Baby Mack, filed a motion for a summary judgment as to the wrongful-death claim against Carmack. In a hearing on the motion, the trial court denied Mack’s motion for a summary judgment and entertained an oral motion for a summary judgment from Carmack. On September 30, 2009, the trial court entered an order granting Carmack’s motion for a summary judgment on the wrongful-death claim. The order provided, in pertinent part:
“The issue before the Court is whether a nonviable fetus has a cause of action for wrongful death. Plaintiffs contend that the Alabama Fetal Homicide Act, Alabama Code [§ ] 13A-6-3, et seq., defines a person as a ‘human being, including an unborn child in útero at any stage of development, regardless of viability.’
*599 “Defendant contends that the wrongful death statute, Section 6 — 5—410, Alabama Code 1975, only allows for wrongful death of a viable fetus. See, Lollar v. Tankersley, 613 So.2d 1249 (Ala.1993).
“The Court finds that the Alabama Wrongful Death Act does not allow for a cause of action for a nonviable fetus. Therefore, plaintiffs’ Motion for Summary Judgment for the death of Baby Mack is denied. The Motion for Summary Judgment by defendant Thomas Carmack is granted on the claim for death of Baby Mack.”[2]
On February 26, 2010, the parties notified the trial court that they had settled the remaining claims alleged in the complaint, and they requested that those claims be dismissed with prejudice. On March 15, 2010, the trial court entered an order dismissing the remaining claims with prejudice.
On April 12, 2010, Mack filed a notice of appeal from the summary judgment entered by the trial court in favor of Car-mack concerning the wrongful-death claim.

II. Standard of Revieiv

 “ ‘The standard of review applicable to a summary judgment is the same as the standard for granting the motion....’ McClendon v. Mountain Top Indoor Flea Market, Inc., 601 So.2d 957, 958 (Ala.1992).
“ ‘A summary judgment is proper when there is no genuine issue of material fact arid the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. The burden is on the moving party to make a prima facie showing that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law. In determining whether the movant has carried that burden, the court is to view the evidence in a light most favorable to the nonmoving party and to draw all reasonable inferences in favor of that party. To defeat a properly supported summary judgment motion, the nonmoving party must present “substantial evidence” creating a genuine issue of material fact — “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be. proved.” Ala.Code 1975, § 12-21-12; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).’
“Capital Alliance Ins. Co. v. Thorough-Clean, Inc., 639 So.2d 1349, 1350 (Ala.1994). Questions of law are reviewed de novo. Alabama Republican Party v. McGinley, 893 So.2d 337, 342 (Ala.2004).”
Pritchett v. ICN Med. Alliance, Inc., 938 So.2d 933, 935 (Ala.2006).

III. Analysis

Section 6-5-391, Ala.Code 1975, entitled “Wrongful death of minor” (“the Wrongful Death Act”), provides, in pertinent part, that “[w]hen the death of a minor child is caused by the wrongful act, omission, or negligence of any person ..., the father, or the mother ... of the minor may commence an action.”[3] § 6-5-391 (a), *600 Ala.Code 1975. The issue before us in this appeal is the proper application of § 6-5-391(a).
Mack concedes that, in two decisions issued by this Court in 1993 concerning wrongful-death claims arising out of the death of a fetus, this Court held that no cause of action for wrongful death exists if the fetus was not viable at the time of death. See Gentry v. Gilmore, 613 So.2d 1241, 1242 (Ala.1993) (concluding that “the Wrongful Death Act does not provide a cause of action for the death of a nonviable fetus”); and Lollar v. Tankersley, 613 So.2d 1249, 1252 (Ala.1993) (concluding that “a cause of action for death resulting from a pre-natal injury requires that the fetus attain viability either before the injury or before death results from the injury”). Largely on the basis of a recent legislative enactment, Mack now asks this Court to overrule Gentry and Lollar.
In pertinent part, the so-called “Brody Act,” Act No. 2006-419, Ala. Acts 2006, codified as Ala.Code 1975, § 13A-6-1, changed the definition of the term “person” in the article of the Alabama Code defining homicide offenses. Before its amendment in 2006, this article defined the term “person” as “a human being who had been born and was alive at the time of the homicidal act.” § 13A-6-l(2), Ala.Code 1975. As amended by the Brody Act, § 13A-6-l(a)(3), Ala.Code 1975, now defines the term “person” as “a human being, including an unborn child in útero at any stage of development, regardless of viability.”[4] (Emphasis added.)
Mack notes that in Lollar the Court expressly declined to find a cause of action under the Wrongful Death Act for a fetus that has never attained viability “[wjithout a clearer expression of legislative intent.” Lollar, 613 So.2d at 1252-53. She argues that the legislature’s amendment to the homicide article to redefine a “person” as including “an unborn child in útero at any stage of development, regardless of viability” now provides the “clear[ ] expression of legislative intent” missing when Lollar was decided.
Carmack counters that, although the legislature changed the definition of “person” for purposes of homicide, it did not amend the Wrongful Death Act. He cites Ex parte Haynes Downard Andra & Jones, LLP, 924 So.2d 687, 699 (Ala.2005), for the proposition that “ ‘[i]t is an ingrained principle of statutory construction that “[t]he Legislature is presumed to be aware of existing law and judicial interpretation when it adopts a statute” ’ ” (quot *601 ing Ex parte Fontaine Trailer Co., 854 So.2d 71, 83 (Ala.2003), quoting in turn Carson v. City of Prichard, 709 So.2d 1199, 1206 (Ala.1998)). Carmack argues that because the legislature did not amend the Wrongful Death Act when it amended the homicide article in the criminal code, the legislature’s change in the homicide article provides no basis for overruling Collar and Gentry.
An appropriate analysis of these contending positions necessitates that we review the history in Alabama of wrongful-death claims arising out of prenatal injuries. The issue of causes of action for prenatal injuries first arose in Stanford v. St. Louis-San Francisco Ry., 214 Ala. 611, 108 So. 566 (1926). In Stanford, the Court observed that “a legal personality is imputed to an unborn child as a rule of property for all purposes beneficial to the infant after birth” and that in criminal law, because of the state’s interest in “pro-tectfing] life before birth, it is a great crime to kill the child after it is able to stir in the mother’s womb, by an injury inflicted upon the person of the mother, and it may be murder if the child is born alive and dies of prenatal injuries.” 214 Ala. at 612, 108 So. at 566. Nonetheless, the Stanford Court concluded that “[t]he authorities ... are unanimous in holding that a prenatal injury affords no basis for an action in damages, in favor either of the child or its personal representative.” Id. The reason behind this rule was the belief that “ ‘a child before birth is, in fact, a part of the mother and is only severed from her at birth.’ ” 214 Ala. at 612, 108 So. at 567 (quoting Allaire v. St. Luke’s Hosp., 184 Ill. 359, 368, 56 N.E. 638 (1900)).
In Huskey v. Smith, 289 Ala. 52, 265 So.2d 596 (1972), this Court overruled Stanford insofar as it held that a prenatal injury afforded no basis for an action in damages, noting that in doing so Alabama would “join every other jurisdiction in recognizing such a cause of action.” 289 Ala. at 54, 265 So.2d at 596. In Huskey, a woman who was seven-and-a-half months’ pregnant was a passenger in an automobile that was struck by an automobile operated by the defendant. “Five days after the accident the child she was carrying was born alive but died five days after his birth.” 289 Ala. at 53, 265 So.2d at 596. The Court concluded that the term “minor child” in the predecessor to § 6-5-391 (a) included an unborn child who was viable at the time of a prenatal injury, who thereafter was born alive, but who later died. 289 Ala. at 55, 265 So.2d at 596.[5]
The Court observed that the reasoning in Stanford was based on the outdated “medical opinion of that day that a fetal child was a part of the mother and was not a ‘person’ until it was born.” 289 Ala. at 54, 265 So.2d at 596-97. Importantly, the Huskey Court also reasoned that
“to give further force to Stanford would give protection to an alleged tort-feasor. In Alabama, especially, this would seem anomalous. Our wrongful death statute provides for punitive damages. Bell v. Riley Bus Lines, 257 Ala. 120, 57 So.2d 612 (1952). By the criminal law, it is a great crime to kill the child after it is able to stir in the mother’s womb, by an injury inflicted upon the person of the mother, and it may be murder if the child is born alive and dies of prenatal injuries. Clarke v. State, 117 Ala. 1, 23 *602 So. 671 (1897). One of the purposes of our wrongful death statute is to prevent homicides. Bell v. Riley Bus Lines, supra. If we continued to follow Stanford, which followed then existing precedent, a defendant could be responsible criminally for the homicide of a fetal child but would have no similar responsibility civilly. This is incongruous.”
289 Ala. at 54-55, 265 So.2d at 597-98 (emphasis omitted and emphasis added). The Huskey Court thus recognized that the purpose and reach of the Wrongful Death Act were tied to the State’s criminal homicide statutes.
Approximately a year after Huskey was decided, the Court in Wolfe v. Isbell, 291 Ala. 327, 280 So.2d 758 (1973), was confronted with a wrongful-death case involving prenatal injuries to a previable fetus that was born alive. The facts in Wolfe were that on March 10, 1970, the defendants, operating a truck, collided with an automobile carrying the mother and father of the child. “[A]s a proximate consequence thereof, the ... minor child, being then carried as an unborn child by [the] wife, suffered grievous prenatal injuries and prenatal damages from which she subsequently died on to-wit, June 16, 1970, approximately fifty minutes after being born alive on said date and occasion.” 291 Ala. at 329, 280 So.2d at 759. The question in Wolfe concerned
“whether or not a tort action can be maintained by the father to recover damages for the wrongful death of his minor child, resulting from prenatal injuries, negligently inflicted while a nonviable fetus, if the injured child is subsequently born alive. By nonviable we mean not capable of living, growing, or developing and functioning successfully, the antithesis of viable, which is defined as having attained such form and development of organs as to be normally capable of living outside the uterus.”
291 Ala. at 329, 280 So.2d at 759. Thus, the fetus sustained injuries in the accident before he was viable, and he died as a result of those injuries shortly after being born three months later, postviability. The Court in Wolfe concluded that the father could maintain a wrongful-death action in such a situation.
In reaching its conclusion, the Wolfe Court first addressed the defendants’ contention that they “owed no duty to a nonviable fetus as a minor under [the predecessor statute to § 6-5-391].” 291 Ala. at 330, 280 So.2d at 760. The Court responded by observing that, if the question whether a duty exists to a previable fetus is one of “existence,”
“ ‘medical authority has recognized long since that the child is in existence from the moment of conception, and for many purposes its existence is recognized by the law.’ Citing Herzog, Medical Jurisprudence, 1931, §§ 860-975; Malloy, Legal Anatomy and Surgery, 1930, 669-687. And Prosser adds: ‘All writers who have discussed the problem have joined in condemning the old rule [that the defendant could owe no duty of conduct to a person who was not in existence at the time of the action], in maintaining that the unborn child in the path of an automobile is as much a person in the street as the mother, and in urging that recovery should be allowed upon proper proof.’ ”
Id. (quoting Prosser, Law of Torts, p. 336 (4th ed.1971)).
The Wolfe Court then turned its attention to the fact that “it is essential to the maintenance of an action for death by wrongful act or default that the act or default be of such character as would have supported an action by the deceased for his injuries if he had survived.” 291 Ala. *603 at 330, 280 So.2d at 760. “It follows,” the Court reasoned, “that the right to maintain an action for the wrongful death of an unborn child depends on the right of the particular child, if he had survived, to maintain an action for injuries sustained.” 291 Ala. at 330, 280 So.2d at 761 (emphasis added). Implicitly indicating that the emphasized language is the dis-positive criterion, the Court noted and agreed with the corollary position of the plaintiff
“that it makes no difference, in deciding the right to a cause of action for wrongful death, whether the fetal child was viable or not when the injury was inflicted, if the child was subsequently born alive, but died from the injury....
“While the decisions dealing with the problem before us are certainly not without divergent views, the more recent authorities emphasize that there is no valid medical basis for a distinction based on viability, especially where the child has been born alive. These proceed on the premise that the fetus is just as much an independent being prior to viability as it is afterwards, and that from the moment of conception, the fetus or embryo is not a part of the mother, but rather has a separate existence within the body of the mother.”
291 Ala. at 330-31, 280 So.2d at 761 (emphasis added).
The Wolfe Court then proceeded to review numerous authorities and how each had concluded that a distinction based on viability in wrongful-death actions was unsatisfactory. For example, the Court noted:
“Though unnecessary to a decision in Puhl v. Milwaukee Auto. Ins. Co., 8 Wis.2d 343, 99 N.W.2d 163 (1959), the court pointed out that the viability theory, permitting actions for injuries to viable unborn children, but not to nan-viable children has been challenged as unrealistic in that it draws an arbitrary line between viability and nonviability, and fails to recognize the biological fact that there is a living human being before viability. The court said in that case that a child is no more a part of its mother before it becomes viable than it is after viability, and that it would be more accurate to say that the fetus from conception lived within its mother rather than as a part of her.”
291 Ala. at 331, 280 So.2d at 761 (emphasis added). Among the other authorities consulted by the Wolfe Court were Prosser,[6] Restatement (Second) of Torts,[7] and deci *604 sions from various other jurisdictions.[8] The Wolfe Court summarized its review of the authorities by quoting from Torigian v. Watertown News Co., 352 Mass. 446, 448, 225 N.E.2d 926, 927 (1967), in which the Massachusetts Supreme Judicial Court stated that, “ ‘[t]o the extent that the views of textwriters and legal commentators have come to our attention, they are unanimously of the view that nonviability of a fetus should not bar recovery.’ ” 291 Ala. at 333, 280 So.2d at 763.
In short, the Wolfe Court concluded that the father could maintain an action for the wrongful death of his unborn child even though the injuries that allegedly caused the death occurred before the fetus became viable. The Court emphasized that the important fact was that the child was born alive, not the point in the pregnancy at which the fetus was injured.
About a year after its decision in Wolfe, however, the Court was presented with a case in which a child who suffered prenatal injuries was not born alive. The case of Eich v. Town of Gulf Shores, 293 Ala. 95, 300 So.2d 354 (1974), concerned an eight- and-a-half-month pregnant woman who was involved in an automobile accident in which “she suffered injuries which culminated in the death of her fetal child who was stillborn.” 293 Ala. at 97, 300 So.2d at 355. The Eich Court held that “the parents of an eight and one-half month old stillborn fetus are entitled to maintain an action for the wrongful death of the child.” 293 Ala. at 100, 300 So.2d at 358. In so holding, the Court rejected the position that, “as a matter of substantive statutory law, live birth is a prerequisite to liability for wrongful death in Alabama.” 293 Ala. at 98, 300 So.2d at 356.
The Eich Court rejected the notion that the requirement that the child be born alive should be maintained in wrongful-death jurisprudence because it provides a bright line for matters of proof of causation. In doing so, the Court reasoned that, “once we accept the basic premise that a fetus is a potential human life at the time of the injury, we feel that the substantive rights resulting from wrongful death must be protected, regardless of the inherent practical difficulties” as to proof of causation. 293 Ala. at 100, 300 So.2d at 358 (emphasis added).
The Eich Court also highlighted a logical problem created by drawing a distinction based on whether the child is born alive:
“To deny recovery where the injury is so severe as to cause the death of a fetus subsequently stillborn, and to allow recovery where injury occurs during pregnancy and death results therefrom after a live birth, would only sene the tortfea-sor by rewarding him for his severity in inflicting the injury. It would be bizarre, indeed, to hold that the greater the harm inflicted the better the opportunity for exoneration of the defendant. Logic, fairness and justice compel our recognition of an action, as here, for *605 prenatal injuries causing death before a live birth.”
293 Ala. at 97, 300 So.2d at 355 (footnote omitted and emphasis added). As the Huskey Court observed, our wrongful-death statutes provide for punitive damages to punish the tortfeasor. The Eich Court noted that it therefore would be strange to maintain a distinction in the law of wrongful death that rewards the tortfea-sor whose action inflicts greater harm.
In reaching its conclusion, the Eich Court underscored the legislative intent of the wrongful-death statutes:
“[T]o allow recovery where the fetus is stillborn is essential to the effectuation of legislative intent. It is a deeply engrained principle of Alabama jurisprudence that the paramount purpose of our wrongful death statutes (§§ 119 and 123) is the preservation of human life....
“It was to implement this legislative intent, then, that the Alabama Supreme Court, through its interpretation of the phrase ‘such damages as the jury may assess,’[9] provided vindication for the tortfeasor’s wrongful conduct. To deny recovery would sanction the tortfeasor’s wrongful act and would clearly negate the primary objective of the statute.”
293 Ala. at 98, 300 So.2d at 356 (footnote omitted and emphasis added). In other words, the Eich Court concluded that the preservation of human life necessitated eliminating the distinction emphasized in Wolfe that a fetus must be born alive in order for the parents to recover under the wrongful-death statutes. Moreover, as in Huskey, the Court in Eich ultimately based its decision on what it referred to as “the pervading public purpose of our wrongful death statute, which is to prevent homicide through punishment of the culpable party and the determination of damages .... ” 293 Ala. at 100, 300 So.2d at 358.
Before the release of the Lollar and Gentry decisions on the same day in 1993, Huskey, Wolfe, and Eich constituted the seminal decisions from this Court concerning causes of action for wrongful death based on prenatal injuries. In each of those cases predating Lollar and Gentry, the Court interpreted the Wrongful Death Act in a manner that eliminated a distinction that otherwise would have prevented recovery for the death of a fetus. Lollar and Gentry halted this trend by concluding that “the term ‘minor child’ in § 6-5-391 does not include a fetus that dies before becoming able to live outside the mother’s womb.” Gentry, 613 So.2d at 1244.
In Lollar, Brenda Lollar was examined by Dr. Felix Tankersley on September 15, 1989, during which it was determined that Lollar was three months’ pregnant. On September 27, Lollar experienced a hemorrhage and Dr. Tankersley told Lollar that she was experiencing an inevitable, first trimester, spontaneous abortion, i.e., a miscarriage. Dr. Tankersley performed a dilatation and curettage (“D and C”) in order to remove the remaining placenta and fetal tissue. On October 9, 1989, Lol-lar began hemorrhaging again, and she returned to Dr. Tankersley for an examination. She was referred to the Obstetrics-Gynecology Center at the University of Alabama at Birmingham (“UAB”) and an ultrasound was performed that showed that Lollar was still carrying a “well developed” fetus with a “viable heartbeat.” 613 So.2d at 1250. Tests further revealed, however, that Lollar had a deficiency of amniotic fluid. On October 13, following *606 the onset of severe pain, Lollar was admitted to UAB, where her uterus was evacuated, resulting in the death of the fetus.
Gentry involved facts quite similar to Lollar. In Gentry, a pregnant Kathleen Gentry visited Dr. Keith Gilmore on August 5, 1983, when she was complaining of “flooding blood, passing clots, and cramping.” 613 So.2d at 1243. Dr. Gentry performed a D & C on Gentry on August 6. An ultrasound test on August 8 revealed an apparently normal 11-week fetus. Gentry miscarried on August 24. It was “undisputed that, at the time of the miscarriage, the 13-week fetus was not viable, that is, it was not capable of living outside the womb.” 613 So.2d at 1243.
As already noted above, the Court concluded in Lollar and Gentry that the Wrongful Death Act did not permit recovery for the death of a fetus that occurs before the fetus attains viability. In reaching this conclusion, the Gentry Court observed that “[i]n Huskey, Wolfe, and Eich, the deaths admittedly occurred after the fetus had attained viability,” while “[t]his case involves an alleged injury to a nonviable fetus and the death of that fetus before the fetus became viable.” 613 So.2d at 1244. In Lollar, the Court provided a further explanation as to the ways in which it believed that Huskey, Wolfe, and Eich supported its conclusion.
“Contrary to the contention that the Eich-Wolfe-Huslcey trilogy abrogated the viability requirement, a close reading of these cases reveals that viability was the common — indeed, the decisive— consideration, in each case. Huskey and Eich allowed recovery because the fetus was viable at the time of the injury, and Wolfe allowed recovery because the fetus survived the injury long enough to attain viability. The rule proceeding from these cases, therefore, essentially comports with the analysis of Dr. Tank-ersley and Service America, that is, that a cause of action for death resulting from a pre-natal injury requires that the fetus attain viability either before the injury or before death results from the injury. To eliminate this requirement ... would require a substantial expansion of the principle emanating from these cases.”
Lollar, 613 So.2d at 1252 (emphasis omitted and emphasis added).
The Lollar Court was correct that the facts in Huskey, Wolfe, and Eich involved fetuses that were viable either at the time of the injury or at the time of death. As our review of these cases has shown, however, viability was not the “decisive” consideration in this trio of cases. In Huskey, the Court opened the door for recovery in a wrongful-death action based on prenatal injuries by expressly overruling Stanford because the ruling in Stanford, was based on the outdated “medical opinion of that day that a fetal child was a part of the mother and was not a ‘person’ until it was born.” 289 Ala. at 54, 265 So.2d at 596-97 (emphasis omitted). As discussed at length above, the Wolfe Court emphasized the lack of a principled distinction based on viability and quoted substantial deci-sional authority and well respected secondary sources for the proposition that, in all good conscience, fairness, and logic, a duty of care is owed to a fetus even if it has not yet attained the ability to live outside the womb. 291 Ala. at 330-31, 280 So.2d at 761. In Eich, the Court recognized that the fetus is “a potential human life at the time of the injury,” 293 Ala. at 100, 300 So.2d at 358, and thus held that live birth was not a prerequisite to recovery for the death of a fetus. Among other things, the Eich Court rejected the notion that recovery should be denied “where the injury is so severe as to cause the death of a fetus” and that “[i]t would be bizarre, indeed, to *607 hold that the greater the harm inflicted, the better the opportunity for exoneration of the defendant.” 293 Ala. at 97, 300 So.2d at 355. In sum, though Huskey, Wolfe, and Eich involved viable fetuses, their holdings did not turn on that fact.
In a lengthy dissent in Gentry, Justice Maddox stated that in his view the Court had misread Wolfe and Eich. “I read the essential holdings of Wolfe and Eich to be that viability at the time of injury and live birth are irrelevant to recovery; consequently, I believe those holdings support my conclusion [that a wrongful-death cause of action exists for the death of a nonviable fetus].” Gentry, 613 So.2d at 1248 (Maddox, J., dissenting). Justice Maddox reasoned:
“[U]nder principles established in Wolfe and Eich, neither viability at the time of injury, nor live birth, is a prerequisite to recovery for the wrongful death of a fetus.
“These same principles are no less compelling when both the injury and the death occurred before viability.... [Viability is an arbitrary, artificial, and varying standard that is illogical when considered against this Court’s recognition in Wolfe of the biological separateness of mother and child from the moment of conception.”
613 So.2d at 1249 (Maddox, J., dissenting).
In support of his conclusion that viability is no less arbitrary a standard when applied to the time of death than it is when applied to the time of injury, Justice Maddox cited further authorities from which he concluded that
“the overwhelming majority of commentators has criticized distinctions based on viability of the fetus, for a number of reasons: A child is an entity, a ‘person,’ from the moment of conception, 1 Stuart M. Speiser, et al., Recovery for Wrongful Death and Injury § 4.37, at 204 (3rd ed.1992); the first trimester is the developmental period in which the fetus is most susceptible to environmental influences, David A. Gordon, The Unborn Plaintiff, 63 Mich. L.Rev. 579, 589 (1965); viability is not determinative or relevant to the question of the tort-fea-sor’s ability to escape liability, David Kader, The Law of Tortious Prenatal Death Since Roe v. Wade, 45 Mo. L.Rev. 639, 659-60 (1980); tort-feasors should not be better off if the fetus dies from injuries sustained before viability than they would be if the fetus lives, Frank J. Hartye, Comment, Tort Recovery for the Unborn Child, 15 J. Fam. L. 276, 297 (1976-77); ‘[potential life is no less potential during the first weeks of pregnancy than in the last weeks, and a fetus is entitled to develop without outside interference,’ Michael P. McCready, Comment, Recovery for the Wrongful Death of a Fetus, 25 U. Rich. L.Rev. 391, 405 (1991); viability distinctions impede the goals of the wrongful death statutes, Gary A. Meadows, Comment, Wrongful Death and the Lost Society of the Unborn, 13 J. Legal Med. 99, 114 (1992); viability should not be the point at which the unborn gain legal protection, because ‘viability is dependent upon a number of factors, including the weight and race of a fetus, maternal age and health, nutritional deficiencies and psychological elements,’ Patricia A. Meyers, Comment, Wrongful Death and the Unborn Child: A Look at the Viability Standard, 29 S.D. L.Rev. 86, 96-97 (1983); ‘the actual medical determination of the point at which a fetus attains viability is uncertain,’ Karen Rene Osborne, Comment, Torts — The Right of Recovery for the Tortious Death of the Unborn, 27 How. L.J. 1649, 1661 (1984); a viability standard results in an injustice, because a negligently injured, non *608 viable fetus probably would have survived but for the wrongful act, Janet I. Stich, Comment, Recovery for the Wrongful Death of a Viable Fetus: Wer-ling v. Sandy, 19 Akron L.Rev. 127, 138 (1985); ‘viability is as arbitrary a standard in wrongful death cases as was birth,’ Sheryl Anne Symonds, Comment, Wrongful Death of the Fetus: Viability Is Not a Viable Distinction, 8 U. Pug. Sound L.Rev. 103, 115 (1984); and viability is ‘[without a compelling evidential or medical justification’ and is ‘an artificial barrier to wrongful death recovery,’ Richard E. Wood, Comment, Wrongful Death and the Stillborn Fetus: A Common Law Solution to a Statutory Dilemma, 43 U. Pitt. L.Rev. 809, 835 (1982).”
Id. at 1248-49 (Maddox, J., dissenting)(emphasis added).[10]
Although not cited by Justice Maddox, the most recognized treatise on the law of torts observed at the time of the Gentry decision that
“[vjiability of course does not affect the question of the legal existence of the unborn, and therefore of the defendant’s duty, and it is a most unsatisfactory criterion, since it is a relative matter, depending on the health of the mother and child and many other matters in addition to the stage of development. Certainly the infant may be no less injured; and logic is in favor of ignoring the stage at which the injury occurs. With the recent advances in embryology and medical technology, medical proof of causation in these cases has become increasingly reliable, which argues for eliminating the viability or other arbitrary developmental requirement altogether.”
W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 55, at 369 (5th ed.l984)(emphasis added).[11]
Commentators have continued to criticize the viability distinction in the years since Gentry was decided. For example, one commentator has noted that the viability standard, like the born-alive test, has outlived its usefulness:
“While not every jurisdiction has stopped using the born-alive test first set out in Bonbrest [v. Kotz, 65 F.Supp. 138 (D.D.C.1946) ], most have abandoned the born alive rule, finding it stringent and unjust. Similarly, the single-entity view was rejected as archaic and outmoded due to subsequent developments in science and technology. The viability test, at least in its application to tort law, is likewise outmoded and archaic. The viability test does not affect the defendant’s legal duty, and its relative nature makes it an unsatisfactory criterion. As is the case with any tort the issues at hand are first, whether the defendant owed a duty of care to avoid unreasonable risk of harm to others, *609 second whether the defendant breached that duty of care, and third whether that breach of duty caused the harm. Although the age of a defendant’s victims, whether they are born or unborn, may be relevant in the analysis of the reasonable standard of care for a particular case, it does not act as a bright line preventing the case from ever reaching a jury. The viability line, although useful as a guide for abortion cases, is an arbitrarily drawn line, and if the law relies too heavily on arbitrary line drawing it may very likely become ... mechanical, superficial, dry, sterile formalism. ...”
Daniel S. Meade, Wrongful Death and the Unborn Child: Should Viability be a Prerequisite for a Cause of Action?, 14 J. Contemp. Health L. & Pol’y 421, 441 (1998) (footnotes omitted and emphasis added). See also Sarah J. Loquist, The Wrongful Death of a Fetus: Erasing the Barrier between Viability and Non-Viability, 36 Wash. L.J. 259, 288 (1997) (“The viability requirement is difficult to apply because it is so hard to determine exactly when a fetus becomes viable. Furthermore, medical advances continue to change the point at which a fetus is viable.”).
In Lollar, the Court cited as one of its key reasons for declining to interpret the term “minor child” in § 6-5-391, Ala.Code 1975, to include a nonviable fetus the fact that, “[a]t the present time, it appears that no court in the United States has, without a clear legislative directive, recognized a cause of action for the wrongful death of a fetus that has never attained a state of development exceeding that attained in this case.” Lollar, 613 So.2d at 1252. Since this Court’s decisions in Lollar and Gentry, the legal landscape has changed in certain material respects.
Six jurisdictions (Illinois, Louisiana, Missouri, Oklahoma, South Dakota, and West Virginia) now specifically permit wrongful-death actions even where the death of the fetus occurs before the fetus becomes viable. The adoption of the pre-viability standard in five of these six jurisdictions occurred after Lollar and Gentry were decided. See Pino v. United States, 183 P.3d 1001 (Okla.2008); Wiersma v. Maple Leaf Farms, 543 N.W.2d 787 (S.D.1996); Connor v. Monkem Co., 898 S.W.2d 89 (Mo.1995); Farley v. Sartin, 195 W.Va. 671, 466 S.E.2d 522 (1995); Smith v. Mercy Hosp. & Med. Ctr., 203 Ill.App.3d 465, 148 Ill.Dec. 567, 560 N.E.2d 1164 (1990); and La. Civ.Code Ann. art. 26 (1999). In Illinois, Louisiana, Missouri, and South Dakota, the legislatures expressly changed the wording of their respective wrongful-death statutes to include an “unborn child.” The Supreme Courts of West Virginia and Oklahoma adopted a previability standard absent any specific change in the wrongful-death statutes by their respective state legislatures.
In Farley, the West Virginia Supreme Court summarized its decision to eliminate the distinction between viability and nonvi-ability for prenatal wrongful-death actions as follows:
“In jurisdictions where the viability standard is controlling, the tortfeasor remains unaccountable for the full extent of the injuries inflicted by his or her wrongful conduct. In our judgment, justice is denied when a tortfeasor is permitted to walk away with impunity because of the happenstance that the unborn child had not yet reached viability at the time of death. The societal and parental loss is egregious regardless of the state of fetal development. Our concern reflects the fundamental value determination of our society that life— old, young, and prospective — should not be wrongfully taken away. In the absence of legislative direction, the over *610 riding importance of the interest that we have identified merits judicial recognition and protection by imposing the most liberal means of recovery that our law permits.”
Farley, 195 W.Va. at 682, 466 S.E.2d at 533 (emphasis added). In support of its decision, the Farley court quoted at length from Justice Maddox’s dissent in Gentry. 195 W.Va. at 682-83, 466 S.E.2d at 533-34.
In Pino, the Oklahoma Supreme Court noted the fact that Oklahoma’s wrongful-death statute does not mention the death of a “person”; instead, it creates a cause of action “[w]hen the death of one is caused by the wrongful act or omission of another.” Okla. Stat. Ann. tit. 12, § 1053 (West 2000). The Oklahoma Supreme Court reasoned that in using the word “one,” the legislature left the reach of the statute to the development of the common law. The Pino court observed that maintaining the viability rule “would create the anomalous result of allowing a tortfeasor to escape liability for causing the death of a nonviable fetus while subjecting to liability the tortfeasor whose acts caused a nonfatal injury.” Pino, 183 P.3d at 1005. The Pino court also emphasized that interpreting Oklahoma’s wrongful-death statute as allowing causes of action for nonviable fetuses “is in keeping with the focus being placed not on a fetus’s status but on the tortious conduct.” Id. (emphasis added).
In sum, at the time Lollar and Gentry were decided, the viability rule already had been undermined in this State by this Court’s reasoning in its earlier decisions in Wolfe and Eich. As the above-quoted passage in Prosser and Justice Maddox’s dissent in Gentry clearly demonstrated, commentators also already had heavily criticized the viability rule. Since 1993, criticisms of the viability rule have continued, if not increased, and some jurisdictions have recognized the arbitrary and illogical nature of the viability rule.
Nonetheless, at the time Lollar and Gent'i’y were decided, there remained one significant factor that provided some support for the viability rule: Alabama’s homicide statutes applied only to persons “who had been born and [were] alive at the time of the homicidal act.” § 13A-6-l(2), Ala.Code 1975. In concurring in the result in both Gent'i’y and Lollar, Justice Houston wrote specially and used the language of the homicide statute to argue that Eich should be overruled because that decision eliminated any distinction based on the injured fetus being born alive. Justice Houston argued for an approach that he believed would be “consistent with the criminal law”:
“To convict a person of homicide, the victim must be ‘a human being who had been born [and was] alive at the time of the homicidal act.’ Ala.Code 1975, § 13A-6-l(2). This, I believe, is consistent with the common law. See § 13A-6-1 commentary. There should not be different standards in wrongful death and homicide statutes, given that the avowed public purpose of the wrongful death statute is to prevent homicide and to punish the culpable party and not to compensate for the loss.”
Gentry, 613 So.2d at 1245 (Houston, J., concurring in the result); Lollar, 613 So.2d at 1253 (Houston, J., concurring in the result).
Our legislature has now expressly amended Alabama’s homicide statutes to include as a victim of homicide “an unborn child in útero at any stage of development, regardless of viability.” § 13A-6-l(a)(3), Ala.Code 1975 (emphasis added). This change constitutes clear legislative intent to protect even nonviable fetuses from homicidal acts. As Justice Houston’s comment in his special writings in Gentn-y and *611 Lollar indicated, this Court repeatedly has emphasized the need for congruence between the criminal law and our civil wrongful-death statutes. We have already noted that the Huskey Court stated that “[o]ne of the purposes of our wrongful death statute is to prevent homicides.” Huskey, 289 Ala. at 55, 265 So.2d at 597. The Court in Eich similarly observed that “the pervading public purpose of our wrongful death statute ... is to prevent homicide through punishment of the culpable party and the determination of damages by reference to the quality of the tortious act....” Eich, 293 Ala. at 100, 300 So.2d at 358.
The wrongful-death statutes seek to prevent homicides. The Court in Nettles v. Bishop, 289 Ala. 100, 103, 266 So.2d 260, 262 (1972), stated that the “primary purpose” in awarding damages under what it referred to as the “homicide statute” “is to punish the defendant and to deter others from like conduct.” The Eich Court emphasized that “the damages recoverable under [the Wrongful Death Act] are entirely punitive and are based on the culpability of the defendant and the enormity of the wrong, and are imposed for the preservation of human life.” Eich, 293 Ala. at 98, 300 So.2d at 356.
Given the purpose of the Wrongful Death Act of preventing homicide, we agree with the Huskey Court that it would be “incongruous” if “a defendant could be responsible criminally for the homicide of a fetal child but would have no similar responsibility civilly.” Huskey, 289 Ala. at 55, 265 So.2d at 597-98. Moreover, the viability rule, much like the born-alive rule, actually benefits the tortfeasor who inflicts a more severe injury. Under the viability rule, a tortfeasor who inflicts an injury that causes the immediate death of a nonviable fetus escapes punishment, while a tortfeasor who inflicts an injury that does not result in death, or that results in death only after the fetus attains viability, may be liable for damages. As the Eich Court reasoned, “[i]t would be bizarre, indeed, to hold that the greater the harm inflicted the better the opportunity for exoneration of the defendant,” especially given the focus in the Wrongful Death Act on punishing the wrongdoer by allowing punitive damages. Eich, 293 Ala. at 97, 300 So.2d at 355.
In sum, it is an unfair and arbitrary endeavor to draw a line that allows recovery on behalf of a fetus injured before viability that dies after achieving viability but that prevents recovery on behalf of a fetus injured that, as a result of those injuries, does not survive to viability. Moreover, it is an endeavor that unfairly distracts from the well established fundamental concerns of this State’s wrongful-death jurisprudence, i.e., whether there exists a duty of care and the punishment of the wrongdoer who breaches that duty. We cannot conclude that “logic, fairness, and justice” compel the drawing of such a line; instead, “logic, fairness, and justice” compel the application of the Wrongful Death Act to circumstances where prenatal injuries have caused death to a fetus before the fetus has achieved the ability to live outside the womb.
In accord then with the numerous considerations discussed throughout this opinion, and on the basis of the legislature’s amendment of Alabama’s homicide statute to include protection for “an unborn child in útero at any stage of development, regardless of viability,” § 13A-6-l(a)(3), we overrule Lollar and Gentry, and we hold that the Wrongful Death Act permits an action for the death of a previable fetus. We therefore reverse the summary judgment in favor of Carmack and remand the *612 action for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
MALONE, C.J., and WOODALL, STUART, BOLIN, PARKER, MURDOCK, SHAW, MAIN, and WISE, JJ., concur.

. Although the notice of appeal describes the appellant as “the personal representative” of Baby Mack, § 6-5-391(a), Ala.Code 1975, contemplates that an action such as this be brought by a mother or a father of a deceased child in his or her capacity as such.

. Matthew Taul has filed an appellee's brief in this Court. However, the trial court's order addresses only the summary-judgment motion filed by Carmack, and a summary judgment was entered for Carmack only. It appears that the wrongful-death claim against Taul was dismissed with the other claims on March 15, 2010. See infra.

. Although the wrongful-death count in the complaint filed by Mack and Thomas references § 6-5-410, Ala.Code 1975, the general *600 statute providing for a claim for a wrongful death in Alabama, our research reveals that Alabama cases concerning claims based on the wrongful death of a fetus invariably have entailed consideration of and reliance upon § 6-5-391, Ala.Code 1975, or its substantially similar predecessor, Title 7, § 119, Ala.Code 1940. The briefs presented to this Court cite primarily § 6-5-391. In their arguments to the trial court concerning the motions for a summary judgment and in their arguments on appeal to this Court, the parties address the cases interpreting the phrase "minor child” in § 6-5-3 91(a) or its predecessor. Accordingly, we consider the issue presented in this appeal as an issue relating to the proper interpretation § 6-5-391. See, e.g., Waters v. Jolly, 582 So.2d 1048, 1055 (Ala.1991) (citing Rule 8(f), Ala. R. Civ. P., and noting that, "[i]n order to do substantial justice, pleadings are to be construed liberally in favor of the pleader”); Grayco Res., Inc. v. Poole, 500 So.2d 1030, 1032 (Ala.1986) (quoting the Committee Comments to Rule 1, Ala. R. Civ. P., stating that " 'the policy of rules such as these is to disregard technicality and form in order that the civil rights of litigants may be asserted and tried on the merits' ”); and Green v. City of Montgomery, 55 So.3d 256, 262 (Ala.Civ.App.2009) (observing that "[i]t is well established that a pleading is judged by its substance rather than by its form”).

. The amendment became effective July 1, 2006. Act No. 2006-419, Ala. Acts 2006.

. The fetus in Huskey was viable at the time of the prenatal injury and was later bom alive. Accordingly, the Court noted that it was "not necessary ... for the Court to decide in this cause whether an action for personal injury or wrongful death would exist before the fetus is viable or under circumstances where the child is stillborn.” 289 Ala. at 55 n. 3, 265 So.2d at 598 n. 3.

. The Wolfe Court quoted Prosser, Law of Torts, p. 336 (4th ed.1971), for the proposition that
"[vjiability, of course, does not affect the question of the legal existence of the foetus, and therefore of the defendant's duty; and it is a most unsatisfactory criterion, since it is a relative matter, depending on the health of mother and child and many other matters in addition to the stage of development. Certainly the infant may be no less injured; and all logic is in favor of ignoring the stage at which it occurs. But with our knowledge of embryology what it is, as we approach the beginning of pregnancy medical knowledge, and therefore medical testimony and medical proof of causes, becomes increasingly unreliable and unsatisfactory, so that there is good reason for caution. This, however, goes to proof rather than principle; and if, as is undoubtedly the case there are injuries as to which reliable medical proof is possible, it makes no sense to deny recovery on any such arbitrary basis."

. See Restatement (Second) of Torts § 869, p. 174-82 (Tent. Draft No. 16, 1970), cited by the Wolfe Court for the proposition that the American Law Institute has "rejected the viability criteri[on] and opted merely for the requirement of live birth as the basis of the cause of action.”

. Among the cases from other jurisdictions cited by the Wolfe Court was Hornbuckle v. Plantation Pipe Line Co., 212 Ga. 504, 93 S.E.2d 727 (1956), in which the Georgia Supreme Court noted: "[A]t what particular period of the prenatal existence of the child the injury was inflicted is not controlling.” Other cases cited from other jurisdictions in Wolfe include Kelly v. Gregory, 282 App.Div. 542, 125 N.Y.S.2d 696 (N.Y.App.1953); Bennett v. Hymers, 101 N.H. 483, 147 A.2d 108, 110 (1958); Smith v. Brennan, 31 N.J. 353, 157 A.2d 497 (1960); and Sinkler v. Kneale, 401 Pa. 267, 164 A.2d 93 (1960). These authorities consistently insist that viability is not a valid distinction for determining whether a duty of reasonable care to a fetus exists and, in turn, whether any injury to a fetus may give rise to a wrongful-death action on its behalf.

. The phrase "and in any case shall recover such damages as the jury may assess” was deleted from § 6-5-3 91(a) by an amendment effective August 8, 1995.

. Justice Maddox explained that his inter- ' pretation of Alabama’s wrongful-death statute would "not cover ... the death of a nonviable fetus in instances where the death of the nonviable fetus resulted from the mother's exercise of her constitutional rights, as those rights have been interpreted by the United States Supreme Court.” 613 So.2d at 1245. The same is true of our opinion in the present case.

. Even leaving aside the referenced "recent advances” in medical technology, any difficulty in proving causation would " 'go[ ] to proof rather than principle; and if, as is undoubtedly the case there are injuries as to which reliable medical proof is possible, it makes no sense to deny recovery on any such arbitrary basis.' ” Wolfe, 291 Ala. at 331, 280 So.2d at 761 (quoting Prosser, Law of Torts, p. 336 (4th ed. 1971)). "Moreover, since the burden of proof is on the plaintiff, any increased difficulty of proof of causation should inure to the benefit of the defendant.” Eich, 293 Ala. at 100, 300 So.2d at 358.