PARKER, Justice
(concurring specially).
This case presents an opportunity for this Court to continue a line of decisions affirming Alabama’s recognition of the sanctity of life from the earliest stages of development. We have done so in three recent cases;[11] we do so again today by holding that the word “child” as used in Alabama’s chemical-endangerment statute, § 26-15-3.2(a)(l), Ala.Code 1975, unambiguously includes an unborn child.
“Liberty finds no refuge in a jurisprudence of doubt.” Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 844, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality opinion). A plurality of United States Supreme Court Justices stated this truism in their misguided effort to stabilize our nation’s abortion jurisprudence by reaffirming “the essential holding of Roe v. Wade [, 410 U.S. 113 (1973) ].”[12] Casey, 505 U.S. at 846. However, as discussed below, by affirming the rejection in *73 Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), of an unborn child’s inalienable right to life, Casey did anything but dispel the shroud of doubt hovering over our nation’s abortion jurisprudence. Rather, Casey has resulted in a jurisprudential quagmire of arbitrary and inconsistent decisions addressing the recognition of an unborn child’s right to life. This legal conundrum has been described as follows:
“While logic may not be the life of the law in all circumstances, should logic and law be at swords’ point? One does not have to be an Aristotelian to recognize the law of non-contradiction. This principle states that it is impossible for a thing to be and not to be at the same time and in the same respect. When it comes to the personhood of the unborn, the law of logic is today sorely challenged by the collision course of fetal rights laws and abortion laws.”
Roger J. Magnuson & Joshua M. Lederman, Aristotle, Abortion, and Fetal Rights, 33 Wm. Mitchell L.Rev. 767, 769 (2007) (footnotes omitted).
In contrast to the reasoning of Roe and Casey, Alabama’s reliance upon objective principles has led this Court to consistently recognize the inalienable right to life inherently possessed by every human being and to dispel the shroud of doubt cast by the United States Supreme Court’s violation of the law of noncontradiction. This sound foundation allows Alabama to provide refuge to liberty — the purported objective of the plurality opinion in Casey. Liberty will continue to find no refuge in abortion jurisprudence until courts refuse to violate the law of noncontradiction and, like Alabama, recognize an unborn child’s inalienable right to life at every point in time and in every respect.

I. Alabama recognizes an unborn child’s inalienable right to life

“The public policy of the State of Alabama is to protect life, born, and unborn.” § 26-22-l(a), Aa.Code 1975. This inalienable right is a proper subject of protection by our laws at all times and in every respect. The Declaration of Independence, one of our nation’s organic laws, recognized that governments are “instituted among men” to protect this sacred right.[13] Accordingly, protecting the inalienable right to life is a proper subject of state action.[14] We have affirmed Alabama’s policy of protecting life at every stage of -development in our recent decisions in Mack v. Carmack, 79 So.3d 597 (Ala.2011), Hamilton v. Scott, 97 So.3d 728 (Ala.2012), Ex parte Ankrom, 152 So.3d 397 (Ala.2013), and in our decision today, by consistently recognizing that an unborn child is a human being from the earliest *74 stage of development and thus possesses the same right to life as a born person.
In Mack,[15] a wrongful-death case, this Court held that § 6-5-391(a), Ala.Code 1975,[16] and § 6-5-410(a), Ala.Code 1975,[17] “permit[] an action for the death of a previable fetus.” Mack, 79 So.3d at 611. Our decision in Hamilton affirmed this holding. In Ankrom, this Court held that the chemical-endangerment statute at issue in the present case, § 26-15-3.2, Ala. Code 1975, protects unborn children from exposure to controlled substances. Today, this Court reaffirms Ankrom. This Court’s decisions consistently recognize that an unborn child’s right to life vests at the earliest stage of development. Although Alabama’s ban on postviability abortions, § 26-22-3(a), Ala.Code 1975,[18] is constrained by the United States Supreme Court’s viability limitation for abortion set forth in Roe and its progeny, this Court has consistently affirmed Alabama’s recognition of the right to life of all unborn children. In my special concurrence in Hamilton, 97 So.3d at 737-47 (Parker, J., concurring specially, joined by Stuart, Bo-lin, and Wise, JJ.), I explained why the viability standard is arbitrary[19] and should *75 be abandoned altogether. As I noted in Hamilton, I am not alone.[20]
My special concurrence in Hamilton was not the first time members of this Court have criticized the viability standard. In Mack, this Court expressed its recognition of the separate and distinct existence of unborn children by quoting Wolfe v. Isbell, 291 Ala. 327, 280 So.2d 758 (1973): “ ‘ “[M]edical authority has recognized ... that the child is in existence from the moment of conception....’”” Mack, 79 So.3d at 602 (quoting Wolfe, 291 Ala. at 330, 280 So.2d at 760, quoting in turn Prosser, Law of Torts, p. 336 (4th ed.1971)). In Wolfe, this Court criticized the viability distinction, as follows:
“[T]he more recent authorities emphasize that there is no valid medical basis for a distinction based on viability .... These proceed on the premise that the fetus is just as much an independent being prior to viability as it is after-wards, and that from the moment of conception, the fetus or embryo is not a part of the mother, but rather has a separate existence within the body of the mother.”
Wolfe, 291 Ala. at 330-31, 280 So.2d at 761. Forty years later, this Court again held that there is no valid basis for the viability standard by expressly rejecting the Court of Criminal Appeals’ application of the chemical-endangerment statute solely to a viable unborn child. See Ankrom, 152 So.3d at 405. Today, we affirm this Court’s holding in Ankrom.
Alabama’s recognition of an unborn child’s right to life at all stages of development is distinct from the vague standard delineated in Casey of “the State’s ‘important and legitimate interest in protecting *76 the potentiality of human life.’ ” Casey, 505 U.S. at 871 (quoting Roe, 410 U.S. at 162).[21] Although subtle, the distinction is nonetheless profound. As explained above, Alabama recognizes that, from the child’s earliest stage of development, the existence of an unborn child is separate from that of its mother’s. Accordingly, Alabama has an interest not only in promoting a sustainable society and a culture that appreciates life, but also in “securing] the blessings of liberty” by protecting the right to life inherent in the new life itself. Ala. Const. 1901 pmbl.
Consistent protection of an unborn child’s right to life at every point in time and in every respect is essential to the duty of the judiciary because, as stated above, “[l]iberty finds no refuge in a jurisprudence of doubt.” Casey, 505 U.S. at 844. Ironically, by affirming “the essential holding of Roe v. Wade,” the plurality in Casey cast a shroud of doubt over our nation’s jurisprudence by suppressing an unborn child’s inalienable right to life.
II. Examples of a jurisprudence of doubt Despite Casey ⅛ reaffirmation of the unsupported “essential holding of Roe v. Wade,”,[22] asserted in the vain hope of stabilizing abortion jurisprudence, we have seen just the opposite since Casey was decided.[23] In court opinions subsequent to Casey, unborn children are contradictorily treated as human beings at one particular point in time and in one particular respect while at the same point in time, but in another respect, are discarded as mere tissue or “products of conception.” See, e.g., Carhart v. Stenberg, 192 F.Bd 1142, 1146 (8th Cir.1999), aff'd, 530 U.S. 914,120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) (describing one method of second-trimester abortion as “remov[ing] the fetus and other products of conception”). The particular status afforded unborn children often depends entirely upon a subjective perception of them in a particular context or from a particular vantage point, rather than upon objective factors that would dispel the shroud of doubt that Casey ⅛ affirmation of Roe cast over our nation’s abortion jurisprudence. Two examples demonstrating the violation of the law of noncontrad-iction in our nation’s abortion jurisprudence follow.[24]

*77
A. Partial-birth-aborbion cases

One of the most puzzling instances ■ of the doubtful jurisprudence resulting from Casey ’s affirmation of Roe is the violation of the law of noncontradiction that is exposed by a comparison of the United States Supreme Court’s “partial-birth-abortion” cases of Stenberg v. Carhart, 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000), and Gonzales v. Carhart, 550 U.S. 124, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007). In Stenberg, the Court struck down a Nebraska statute because it interpreted the statute to ban the two most common late-term abortion procedures. In Gonzales, the Court upheld a federal statute that banned only one of the two “equally gruesome” procedures. Stenberg, 530 U.S. at 946 (Stevens, J., concurring). As discussed below, an unborn child at a particular stage of gestation is treated as a child in Gonzales while referred to merely as “potential life” in Stenberg. This clearly violates the law of noncontradiction.
In Stenberg, an abortion provider challenged the constitutionality of a Nebraska statute providing as follows:
“ ‘No partial birth abortion shall be performed in this state, unless such procedure is necessary to save the life of the mother whose life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy itself.’ Neb.Rev.Stat. Ann. § 28-328(1) (Supp.1999).
“The statute defines ‘partial birth abortion’ as:
“ ‘an abortion procedure in which the person performing the abortion partially delivers vaginally a living unborn child before killing the unborn child and completing the delivery.’ § 28-326(9).
“It further defines ‘partially delivers vaginally a living unborn child before killing the unborn child’ to mean
“ ‘deliberately and intentionally delivering into the vagina a living unborn child, or a substantial portion thereof, for the purpose of performing a procedure that the person performing such procedure knows will, kill the unborn child and does kill the unborn child.’ Ibid.”
Stenberg, 530 U.S. at 921-22.
Justice Kennedy described the two abortion procedures prohibited by the statute and explained the legal challenge to the statute in his dissent:
“The person challenging Nebraska’s law is Dr. Leroy Carhart, a physician who received his medical degree from Hahnemann Hospital and University in 1973. Dr. Carhart performs the procedures in a clinic in Nebraska and will also travel to Ohio to perform abortions there. Dr. Carhart has no specialty certifications in a field related to childbirth or abortion and lacks admitting privileges at any hospital. He performs *78 abortions throughout pregnancy, including when he is unsure whether the fetus is viable. In contrast to the physicians who provided expert testimony in this case (who are board certified instructors at leading medical education institutions and members of the American Board of Obstetricians and Gynecologists), Dr. Carhart performs the partial birth abortion procedure (D & X[ 25]) that Nebraska seeks to ban. He also performs the other method of abortion at issue in the case, the D & E.[ 26J
“As described by Dr. Carhart, the D & E procedure requires the abortionist to use instruments to grasp, a portion (such as a foot or hand) of a developed and living fetus and drag the grasped portion out of the uterus into the vagina. Dr. Carhart uses the traction created by the opening between the uterus and vagina to dismember the fetus, tearing the grasped portion away from the remainder of the body. The traction between the uterus and vagina is essential to the procedure because attempting to abort a fetus without using that traction is described by Dr. Carhart as ‘pulling the cat’s tail’ or ‘drag[ging] a string across the floor, you’ll just keep dragging it. It’s not until something grabs the other end that you are going to develop traction.’ The fetus, in many cases, dies just as a human adult or child would: It bleeds to death as it is torn limb from limb. The fetus can be alive at the beginning of the dismemberment process and can survive for a time while its limbs are being torn off. Dr. Carhart agreed that ‘[w]hen you pull out a piece of the fetus, let’s say, an arm or a leg and remove that, at the time just prior to removal of the portion of the fetus, ... the fetus [is] alive.’ Dr. Carhart has observed fetal heartbeat via ultrasound with ‘extensive parts of the fetus removed,’ and testified that mere dismemberment of a limb does not always cause death because he knows of a physician who removed the arm of a fetus only to have the fetus go on to be born ‘as a living child with one arm.’ At the conclusion of a D & E abortion no intact fetus remains. In Dr. Carhart’s words, the abortionist is left with ‘a tray full of pieces.’
“The other procedure implicated today is called ‘partial birth abortion’ or the D & X. The D & X can be used, as a general matter, after 19 weeks’ gestation because the fetus has become so developed that it may survive intact partial delivery from the uterus into the vagina. In the D & X, the abortionist initiates the woman’s natural delivery process by causing the cervix of the woman to be dilated, sometimes over a sequence of days. The fetus’ arms and legs are delivered outside the uterus while the fetus is alive; witnesses to the procedure report seeing the body of the fetus moving outside the woman’s body. At this point, the abortion procedure has the appearance of a live birth. As stated by one group of physicians, ‘[a]s the physician manually performs breech extraction of the body of a live fetus, excepting the head, she continues in the apparent role of an obstetrician delivering a child.’ With only the head of the fetus remaining in útero, the abortionist tears open the skull. According to Dr. Martin Haskell, a leading proponent of the procedure, the' appropriate instrument to be used at this stage of the *79 abortion is a pair of scissors. Witnesses report observing the portion of the fetus outside the woman react to the skull penetration. The abortionist then inserts a suction tube and vacuums out the developing brain and other matter found within the skull. The process of making the size of the fetus’ head smaller is given the clinically neutral term ‘reduction procedure.’ Brain death does not occur until after the skull invasion, and, according to Dr. Carhart, the heart of the fetus may continue to beat for minutes after the contents of the skull are vacuumed out. The abortionist next completes the delivery of a dead fetus, intact except for the damage to the head and the missing contents of the skull.”
Stenberg, 580 U.S. at 958-60 (Kennedy, J., dissenting, joined by Rehnquist, C.J.(citations omitted)).[27]
Although Nebraska argued that it intended to ban only the dilation and extraction (“D & X”) procedure, the United States Supreme Court held that the wording of the statute could be interpreted to encompass the dilation and evacuation (“D & E”) procedure as well. Therefore, the Court concluded that the Nebraska statute violated the United States Constitution:
“In sum, using this law some present prosecutors and future Attorneys General may choose to pursue physicians who use D & E procedures, the most commonly used method for performing pre-viability second trimester abortions. All those who perform abortion procedures using that method must fear prosecution, conviction, and imprisonment. The result is an undue burden upon a woman’s right to make an abortion decision. We must consequently find the statute unconstitutional.”
■Stenberg, 530 U.S. at 945-46. Thus, the Nebraska statute that was enacted to “prohibit a method of abortion that millions find hard to distinguish from infanticide and that the Court hesitates even to describe” was held to be an undue burden and prohibited by Casey because the description in the statute of this horrendous procedure could be read to also apply to D & E procedures. Stenberg, 530 U.S. at 983 (Thomas, J., dissenting, joined by Rehnquist, C.J., and Scalia, J.). Two of the Justices who formed the majority in Stenberg recognized in a special concurrence that abortions using the D & E procedure are as “equally gruesome” as those using the D & X procedure, yet they argued that the state has no legitimate interest in prohibiting only abortions per *80 formed by D & X in its attempt to establish an ethical line between abortion and infanticide.[28]
The irony of the idea that a state has no legitimate interest in banning one, but not all, “brutal” or “gruesome” methods of killing unborn children[29] was made evident seven years later when the United States Supreme Court issued its opinion in Gonzales. The question presented to the Court in Gonzales was whether the federal Partial-Birth Abortion Ban Act of 2003, 18 U.S.C. § 1531 (“the Act”), was constitutional.[30] Armed with the Court’s dissection of the Nebraska statute in Stenberg, Congress recognized that it must clearly articulate that the Act banned only abortions performed by D & X, as opposed to the piece-by-piece dismemberment of an unborn child during an abortion by D & E, to avoid having the Act overturned by the United States Supreme Court. Thus, the Act artfully defined “partial-birth abortion” as an abortion in which the person performing the abortion
“ ‘deliberately and intentionally vaginally delivers a living fetus until, in the case of a head-first presentation, the entire fetal head is outside the body of the mother, or, in the case of breech presentation, any part of the fetal trunk past the navel is outside the body of the mother, for the purpose of performing an overt act that the person knows will kill the partially delivered living fetus.’ ”
Gonzales, 550 U.S. at 142 (quoting 18 U.S.C. § 1531(b)(1)(A)).
The Court’s majority opinion in Gonzales had a completely different tone than *81 the majority opinion in Stenberg.[31] Gonzales contained the following description of the type of procedure the Act intended to ban:
“Here is ... [a] description from a nurse who witnessed the [prohibited] method performed on a 26 1/2-week fetus and who testified before the Senate Judiciary Committee:
“ ‘ “Dr. Haskell went in with forceps and grabbed the baby’s legs and pulled them down into the birth canal. Then he delivered the baby’s body and the arms — everything but the head. The doctor kept the head right inside the uterus....
“ ‘ “The baby’s little fingers were clasping and unclasping, and his little feet were kicking. Then the doctor stuck the scissors in the back of his head, and the baby’s arms jerked out, like a startle reaction, like a flinch, like a baby does when he thinks he is going to fall.
“‘“The doctor opened up the scissors, stuck a high-powered suction tube into the opening, and sucked the baby’s brains out. Now the baby went completely limp....
“ ‘ “He cut the umbilical cord and delivered the placenta. He threw the baby in a pan, along with the placenta and the instruments he had just used.” ’ ”
Gonzales, 550 U.S. at 188-39 (quoting H.R.Rep. No. 108-58, p. 3 (2003)). Such a description is difficult to read; it shocks even the most callous conscience. Yet, this is the procedure several of the Justices who formed the majority in Stenberg found to be no more gruesome than the procedure they approved in Stenberg — D *82 & E. See Gomales, 550 U.S. at 181-82 (Ginsburg, J., dissenting).
In Gomales, the Court held that the Act did not ban abortions by D & E or several other rarely used procedures. Therefore, the Court concluded that the Act was consistent with the guidelines of Casey because it did not unduly burden the ability to have an abortion.[32]
The United States Supreme Court’s opinions in Stenberg and Gonzales cast a thick shroud of doubt over abortion jurisprudence. A reconciliation of the two opinions leads to a conclusion that a state is free “to draw a bright line that clearly' distinguishes abortion and infanticide” by banning the killing of a completely intact infant mere seconds from being fully delivered so long as another, and perhaps equally gruesome, method of Wiling the child is permitted. Gonzales, 550 U.S. at' 158. Justice Ginsburg’s dissent in Gonzales notes the illogicality of banning only one method of abortion:
“Today’s ruling, the Court declares, advances ‘a premise central to [Casey’s] conclusion’ — i.e., the Government’s ‘legitimate and substantial interest in preserving and promoting fetal life.’ (‘[W]e must determine whether the Act furthers the legitimate interest of the Government in protecting the life of the fetus that may become a child.’). But the Act scarcely furthers that interest: The law saves not a single fetus from destruction, for it targets only a method of performing abortion. See Stenberg, 530 U.S., at 930.... In short, the Court upholds a law that, while doing nothing to ‘preserv[e] ... fetal life,’ bars a woman from choosing intact D & E [, i.e., Í) & X,] although her doctor ‘reasonably believes [that procedure] will best protect [her],’ Stenberg, 530 U.S.,-at 946 (Stevens J., concurring).
“As another reason for upholding the ban, the Court emphasizes that the Act does not proscribe the nonintact D & E procedure. But why not, one might ask. Nonintaet D & E could equally be characterized as ‘brutal,’ involving as it does ‘tearing] [a fetus] apart’ and ‘ripp[ing] off its limbs. ‘[T]he notion that either of these two equally gruesome procedures ... is more akin to infanticide than the other, or that the State furthers any legitimate interest by banning one but not the other, is simply irrational.’ Stenberg, 530 U.S., at 946-947 (Stevens, J., concurring).
“Delivery of an intact, albeit nonviable, fetus warrants special condemnation, the Court maintains, because a fetus that is not dismembered resembles an infant. But so, too, does a fetus delivered intact after it is terminated by injection a day or two before the surgical evacuation, or a fetus delivered through medical induction or cesarean. Yet, the availability of those procedures — along with D & E by dismemberment — the Court says, saves the ban on intact D & E from a declaration of unconstitutionality.”
Gonzales, 550 U.S. at 181-82 (Ginsburg, J., dissenting).
Although Justice Ginsburg was not arguing for a ban of all abortions, her analysis exposes a violation of the law of noncontradiction resulting from a joint reading of Stenberg and Gonzales. If an unborn child is nothing more than a *83 piece of tissue, why should it be afforded any protection at all? On the other hand, if it does have an existence distinct from its mother’s, why is it protected from having its life annihilated by one method but not all methods? The unborn child cannot logically be a separate and distinct human for the purpose of one abortion procedure but not another. Protecting the unborn child’s right to life at all stages of development would eliminate the contradictory reasoning of the Court’s abortion decisions and dispel the shroud of doubt obscuring the unborn child’s right to life.

B. Botched abortions

A second example of our abortion jurisprudence’s violation of the law of noncon-tradiction is the effect that the current jurisprudence has on the prosecution of abortionists who either intentionally or negligently kill a born child after failing to kill it in the womb. This issue was thrust to the forefront of the abortion debate by the recent trial of Kermit Gosnell, a Philadelphia abortionist who was recently convicted of murdering three unwanted babies by snipping their spinal cords with scissors after they were born alive.[33] Gosnell argued that the babies were killed in the womb by an injection of the drug Digoxin and that they then had their spinal cords snipped for some other reason after they were stillborn. The prosecution contended that the babies were not killed in • the womb but were born alive and were then murdered by cutting their spinal cords. Witnesses testified that some of the babies whined, moved their limbs, and shrugged their shoulders before being killed. That the location or method of killing was the decisive factor is an affront to logic.
Consider a tragic hypothetical situation of two lifeless corpses lying side-by-side. One of the corpses belongs to a baby who was born alive and then killed by having its spinal cord snipped while the other baby was killed while in the womb by an injection of Digoxin. The fact that the two corpses may be virtually indistinguishable demonstrates the doubtfulness Of our nation’s abortion jurisprudence. Did one of the innocent babies have a right to life, while the other did not? If so, why? Both babies were distinct human beings with a genetic makeup completely separate from their mothers; both were completely dependent upon others for nourishment and care; both were intentionally killed. The only distinction between the two lifeless bodies is the subjective value, simply based upon the location and method of their demise, that our jurisprudence of doubt affords them. It is morally indefensible to suggest that the actions taken against one child violates an inalienable right to life, while those against the other do not. Why should legal protection of an individual at a particular point in time depend entirely upon his or her subjective relationship to the killer? Such irrational protection defies logic. Recognition of a child’s right to life from the earliest stages of its development would dispel the shroud of doubt from this area of jurisprudence and avoid unequal protection of the two children.

Conclusion

It is impossible for an unborn child to be a separate and distinct person at a particular point in time in one respect and not to be a separate and distinct person at the same point in time but in another respect. Because an unborn child has an inalienable right to life from its earliest stages of development, it is entitled not only to a life *84 free from the harmful effects of chemicals at all stages of development but also to life itself at all stages of development. Treating an unborn child as a separate and distinct person in only select respects defies logic and our deepest sense of morality.
Courts do not have the luxury of hiding behind ipse dixit[34] assertions. The United States Supreme Court has attempted to do so by setting the line for state protection of unborn children at viability in the area of abortion. “It is in fact comforting to witness the' reality that he who lives by the ipse dixit dies by the ipse dixit. But one must grieve for the Constitution.” Morrison v. Olson, 487 U.S. 654, 726, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (Scalia, J., dissenting). To dispel the shroud of doubt shadowing our nation’s abortion jurisprudence, courts must have the courage to allow the law of noncontradiction to dismantle the ipse dixit reasoning of Roe, Casey, and Stenberg and recognize a child’s inalienable right to life at all stages of development. Until then, our grief is not for the Constitution alone; we also grieve for the millions of children who have not been afforded equal value, love, and protection since Roe.[35]

. Ex parte Ankrom, 152 So.3d 397 (Ala.2013); Hamilton v. Scott, 97 So.3d 728 (Ala.2012); and Mack v. Carmack, 79 So.3d 597 ' (Ala.2011).

. In Casey, the Court held that the "essential holding of Roe v. Wade " included the following three parts:
"First is a recognition of the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State. Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman’s effective right to elect the procedure. Second is a confirmation of the State’s power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman’s life or health. And third is the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child. These principles do not contradict one another; and we adhere to each.”
Casey, 505 U.S. at 846.

. The Declaration of Independence set forth this basic function of government, as follows:
"We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed. ...”
Declaration of Independence ¶ 2 (U.S.1776).

. The preamble to the United States Constitution recognized that the new constitution did not create inalienable rights but rather was "ordain[ed] and establish[ed]’’ to “secure the Blessings of Liberty" to every person. U.S. Const, pmbl. Likewise, the preamble to the Alabama Constitution states: "We, the people of the State of Alabama, in order to ... secure the blessings of liberty to ourselves and our posterity, invoking the favor and guidance of Almighty God, do ordain and establish the following Constitution and form of government for the State of Alabama.” Ala. Const. 1901 pmbl.

. Mack contains an exhaustive history of wrongful-death actions brought on behalf of unborn children in Alabama.

. Section 6-5-3 91 (a) provides:
"When the death of a minor child is caused by the wrongful act, omission, or negligence of any person, persons, or corporation, or the servants or agents of either, the father, or the mother as specified in Section 6-5-390, or, if the father and mother are both dead or if they decline to commence the action, or fail to do so, within six months from the death of the minor, the personal representative of the minor may commence an action."

. Section 6-5-410(a) provides, in relevant part, as follows:
"A personal representative may commence an action and recover such dámages as the jury may assess in a court of competent jurisdiction within the State of Alabama where provided for in subsection (e), and not elsewhere, for the wrongful act, omission, or negligence of any person, persons, or corporation, his or her or their servants or agents, whereby the death of the testator or intestate was caused, provided the testator or intestate could have commenced an action for the wrongful act, omission, or negligence if it had not caused death.”

. Section 26-22-3 provides, in relevant part:
"(a) Prohibition. Except as provided in subsection (b), no person shall intentionally, knowingly, or recklessly perform or induce an abortion when the unborn child is viable.
"(b) Exceptions.
"(1) It shall not be a violation of subsection (a) if an abortion is performed by a physician and that physician reasonably believes that it is necessary to prevent either the death of the pregnant woman or the substantial and irreversible impairment of a major bodily function of the woman. No abortion' shall be deemed authorized under this paragraph if performed on the basis of a claim or a diagnosis that the woman will engage in conduct which would result in her death or in substantial and irreversible impairment of a major bodily function.
"(2) It shall not be a violation of subsection (a) if the abortion is performed by a physician and that physician reasonably believes ... that the unborn child is not viable.”

.The arbitrary nature of the viability standard was explained by United States Supreme Court Justice Scalia, as follows:
"The arbitrariness of the viability line is confirmed by the Court's inability to offer any justification for it beyond the concluso-ry assertion that it is only at that point that the unborn child's life ‘can- in reason and all fairness' be thought to override the interests of the mother. Ante, at 870. Precisely why is it that, at the magical second ■when machines currently in use (though not necessarily available to the particular woman) are able to keep an unborn child alive apart from its mother, the creature is suddenly able (under our Constitution) to be protected by law, whereas before that *75 magical second it was not? That makes no more sense than according infants legal protection only after the point when they can feed themselves.”
Casey, 505 U.S. at 990 n. 5 (Scalia, J., concurring in the judgment in part and dissenting in part, joined by Rehnquist, C.J., and White and Thomas, JJ.).

. In Hamilton, I noted:
"Numerous scholars have criticized the viability rule of Roe.[16] Today, ‘there is broad academic agreement that Roe failed to provide an adequate explanation for the viability rule.’ Randy Beck, Gonzales, Casey, and the Viability Rule, 103 Nw. U.L.Rev. 249, 268-69 (2009).
[[Image here]]
"[16] Randy Beck, Self-Conscious Dicta: The Origins of Roe v. Wade’s Trimester Framework, 51 Am. J. Legal Hist. 505, 516— 26 (2011); Randy Beck, Gonzales, Casey, and the Viability Rule, 103 Nw. U.L.Rev. 249, 268-70 (2009); Paul Benjamin Linton, Planned Parenthood v. Casey: The Flight From Reason in the Supreme Court, 13 St. Louis U. Pub.L.Rev. 15, 38-40 (1993); Mark Tushnet, Two Notes on the Jurisprudence of Privacy, 8 Const. Com. 75, 83 (1991) (‘[U]sing the line of viability to distinguish the time when abortion is permitted from the time after viability when it is prohibited (as Roe v. Wade does), is entirely perverse.'); John Hart Ely, The Wages of Crying Wolf: A Comment on Roe v. Wade, 82 Yale LJ. 920, 924-25 (1973); and Mark J. Beutler, Abortion and the Viability Standard — Toward a More Reasoned Determination of the State’s Countervailing Interest in Protecting Prenatal Life, 21 Seton Hall L.Rev. 347, 359 (1991) (‘It is difficult to understand why viability should be relevant to, much less control, the measure of a state's interest in protecting prenatal life.’). See generally Douglas E. Ruston, The Tor-tious Loss of a Nonviable Fetus: A Miscarriage Leads to a Miscarriage of Justice, 61 S.C. L.Rev. 915 (2010); Justin Curtis, Including Victims Without a Voice: Amending Indiana’s Child Wrongful Death Statute,'A3 Val. U.L.Rev. 1211 (2009); and Sarah J. Loquist, The Wrongful Death of a Fetus: Erasing the Barrier Between Viability and Nonviability, 36 Washburn L.J. 259 (1997); see also the sources cited by Justice Maddox in his dissent in Gentry v. Gilmore, 613 So.2d [1241] at 1248-49 [ (Ala. 1993) ].”
Hamilton, 97 So.3d at 742.

. See Martin Wishnatsky, The Supreme Court's Use of the Term "Potential Life": Verbal Engineering and the Abortion Holocaust, 6 Liberty U.L.Rev. 327 (2012) (analyzing the United States Supreme Court’s use of the term "potential life”).

. See Hamilton, 97 So.3d at 742-47 (Parker, J., concurring specially), for a discussion of why the viability standard delineated in Roe was, and remains, unsupportable.

. Chief Justice Rehnquist criticized the authors of the plurality and concurring opinions in Casey for their blind application of stare decisis:
"Of course, what might be called the basic facts which gave rise to Roe have remained the same — women become pregnant, there is a point somewhere, depending on medical technology, where a fetus becomes viable, and women give birth to children. But this is only to say that the same facts which gave rise to Roe will continue to give rise to similar cases. It is not a reason, in and of itself, why those cases must be decided in the same incorrect manner as was the first case to deal with the question. And surely there is no requirement, in considering whether to depart from stare decisis in a constitutional case, that a decision be more wrong now than it was at the time it was rendered. If that were true, the most outlandish constitutional decision could survive forever, based simply on the fact that it was no more outlandish later than it was when originally rendered.”
Casey, 505 U.S. at 955-56 (Rehnquist, C.J., concurring in the judgment in part and dissenting in part, joined by White, Scalia, and Thomas, JJ.).

.In addition to the examples demonstrating » the violation of the law of noncontradiction *77 that are discussed in this writing, which is limited to the context of abortion, my special concurrence in Ankrom, 152 So.3d at 421 (Parker, J., concurring specially), illustrates how unborn children are recognized as persons in five additional areas of law — property law, criminal law, tort law, guardianship law, and health-care law — despite Roe's rejection of the unborn child’s right to life. These provide additional examples of our abortion jurisprudence’s violation of the law of non-contradiction. See also Roger J. Magnuson & Joshua M. Lederman, Aristotle, Abortion, and Fetal Rights, supra.

. “D & X" is a common abbreviation for a procedure known as "dilation and extraetion.”

. "D & E” is a common abbreviation for a procedure known as "dilation and evacuation.”

. Justice Kennedy found the need to supplement the majority's description of the procedures at issue in the case for the following reasons:
"The Court’s failure to accord any weight to Nebraska’s interest in prohibiting partial-birth abortion is erroneous and undermines its discussion and holding. The Court’s approach in this regard is revealed by its description of the abortion methods at issue, which the Court is correct to describe as 'clinically cold or callous.’ The majority views the procedures from the perspective of the abortionist, rather than from the perspective of a society shocked when confronted with a new method of ending human life. Words invoked by the majority, such as ’transcervical procedures,’ ‘[ojsmotic dilators,' ‘instrumental disarticulation,’ and ‘paracervical block,’ may be accurate and are to some extent necessary; but for citizens who seek to know why laws on this subject have been enacted across the Nation, the words are insufficient. Repeated references to sources understandable only to a trained physician may obscure matters for persons not trained in medical terminology. Thus it seems necessary at the outset to set forth what may happen during an abortion.”
Stenberg, 530 U.S. at 957-58 (Kennedy, J., dissenting, joined by Rehnquist, C.J. (citations omitted)).

. Justice Stevens noted that the statute would be irrational for banning one method of abortion, but not the other:
"Although much ink is spilled today describing the gruesome nature of late-term abortion procedures, that rhetoric does not provide me a reason to believe that the procedure Nebraska here claims it seeks to ban is more brutal, more gruesome, or less respectful of 'potential life’ than the equally gruesome procedure Nebraska claims it still allows.... For the notion that either of these two equally gruesome procedures performed at this late stage of gestation is more akin to infanticide than the other, or that the State furthers any legitimate interest by banning one but not the other, is simply irrational."
Stenberg, 530 U.S. at 946-47 (Stevens, J., concurring, joined by Ginsburg, J.).

. Justice Scalia articulated the irony of Sten-berg ’s creation of a Constitutional right to a brutal abortion in his dissent:
"I am optimistic enough to believe that, one day, Stenberg v. Carhart will be assigned its rightful place in the history of this Court's jurisprudence beside Korematsu [ v. United States, 323 U.S. 214 (1944),] and Dred Scott [ v. Sandford, 60 U.S. 393 (1856) ]. The method of killing a human child — one cannot even accurately say an entirely unborn human child — proscribed by this statute is so horrible that the most clinical description of it evokes a shudder of revulsion_The notion that the Constitution of the United States, designed, among other things, ‘to establish Justice, insure domestic Tranquility, ... and secure the Blessings of Liberty to ourselves and our Posterity,’ prohibits the States from simply banning this visibly brutal means of eliminating our half-born posterity is quite simply absurd.”
Stenberg, 530 U.S. at 953 (Scalia, J., dissenting).

.Gonzales recites the history of the passage of the Act:
"In 1996, Congress ... acted to ban partial-birth abortion. President Clinton vetoed the congressional legislation, and the Senate failed to override the veto. Congress approved another bill banning the procedure in 1997, but President Clinton again vetoed it. In 2003, after this Court’s decision in Stenberg, Congress passed the Act at issue here. H.R.Rep. No. 108-58, at 12-14. On November 5, 2003, President Bush signed the Act into law. It was to take effect the following day. 18 U.S.C. § 1531(a).”
Gonzales, 550 U.S. at 140-41 (some citations omitted).

. Writing for the majority, Justice Kennedy refrained from using the term "potential life,” except when quoting Casey, in reference to the unborn children who would be protected by the Act. Martin Wishnatsky notes the significance of the Court's change in tone:
‘‘[Gonzales ], the Court’s most recent major abortion case, addressed partial-birth abortion, this time upholding a state ban. Justice Kennedy's majority opinion, quoting Casey, twice mentioned ‘the State’s interest in potential life.’ Justice Ginsburg, in dissent, mentioned it once. But more significant than fewer mentions of ‘potential life' was Justice Kennedy’s adoption of new terminology to describe life in the womb. Instead of 'potential life,' he used the phrase 'the life of the fetus that may become a child.’ Is this an improvement? The infant in the womb is still subject to a dehumanizing medical term — considered less than a child. Yet somehow the departure from 'potential life’ with its heavy freight of association with abortion-on-demand seems a step in the right direction. But Justice Kennedy went further, noting that the State has a legitimate purpose 'to promote respect for life, including life of the unborn.' He spoke of the 'stage of the unborn child's development,' and, quoting Casey, ‘profound respect for the life of the unborn.’ He twice referred to ‘fetal life’ and also quoted a nurse’s description of the puncturing of a child’s skull that used the term ‘baby’ eight times.
"From ‘potential life,’ the Court has progressed to ‘unborn life,’ which is a significant step. Later, Justice Kennedy referred to ‘the fast-developing brain of [an] unborn child, a child assuming the human form.’ A child halfway out of the womb has certainly long since assumed 'the human form.’ The Court's acknowledgment of the humanity of the unborn child is a labored form of intellectual birth, a ‘rough beast’ slouching towards Bethlehem to be born. Justice Ginsburg, in dissent, complained about the majority's new nomenclature. 'A fetus is described as an "unborn child,” ’ she objected, ‘and as a "baby.” ’ She has reason for concern. Once the 'potential life' misnomer is discarded, the Court’s abortion jurisprudence may go with it.”
Martin Wishnatsky, The Supreme Court’s Use of the Term "Potential Life”: Verbal Engineering and the Abortion Holocaust, 6 Liberty U.L.Rev. 327, 342-43 (2012) (footnotes omitted).

. Justice Thomas wrote a short concurring opinion to "reiterate [his] view that the Court’s abortion jurisprudence, including Casey and Roe v. Wade, has no basis in the Constitution” but that the he joined the Court’s opinion because it "accurately applies current jurisprudence.” Gonzales, 550 U.S. at 169 (Thomas, J., concurring, joined by Sca-liá, J.).

. Commonwealth of Pennsylvania v. Gosnell, (CP-51-CR-0001667-2011) (Pa. Ct. of Common Pleas of Philadelphia Cnty.2013).

. "[H]e himself said it." Black's Law Dictionary 743 (5th ed.1979).

. It is estimated that as of January 2014 over 56 million children have been killed before birth. See The State of Abortion In the United States 27 (National Right to Life Committee, Inc., January 2014) ("On the basis of the most recent reports from the U.S. Centers for Disease Control (CDC) and the private research Guttmacher Institute, National Right to Life estimates that there have been more than 56 million abortions in America since 1973....”).